IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 7, 2008

**STATE OF TENNESSEE v. PHILLIP ANTHONY FARRIS**

**Appeal from the Criminal Court for Davidson County**
**No. 2006-A-748     Seth Norman, Judge**

---

**No. M2007-02686-CCA-R3-CD - Filed Janaury 22, 2009**

---

The Defendant, Phillip Anthony Farris, pleaded guilty to one count of second degree murder and two counts of aggravated kidnapping. The sentencing court determined that he should serve his aggravated kidnapping sentences concurrently. Those sentences were ordered to be served consecutively to his sentence for second degree murder. The Defendant now appeals the decision to order consecutive sentences. After conducting a de novo review, we affirm the judgment of the sentencing court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and J.C. MCLIN, JJ., joined.

F. Michie Gibson, Nashville, Tennessee, for the appellant, Phillip Anthony Farris.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Renee Erb, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

The Defendant did not include a transcript of his guilty plea hearing in the record on appeal. We have gleaned the following facts from the proof presented at his sentencing hearing, as well as statements made by the State, defense counsel, and the sentencing court.

The Defendant, originally charged with eleven felony counts, pleaded guilty on August 23, 2007, to one count of second degree murder and two counts of aggravated kidnapping. The State dropped the other charges against him. The Defendant accepted a twenty-year sentence for second

degree murder and an eight-year sentence for each count of aggravated kidnapping. These sentences, because of the Defendant's status as a violent offender, are to be served at 100%. The sole issue to be determined by the trial court was whether the Defendant would serve his sentences concurrently or consecutively.

The Defendant was sentenced on October 16, 2007. He testified that two years before committing the crimes in this case he had divorced his wife, losing "his home and his family." He recovered a significant amount of money in his divorce settlement, but in his ensuing depression he squandered it on alcohol and drugs.

The Defendant presented four witnesses to testify on his behalf. All of them offered substantially similar testimony: that they had known the Defendant for a significant period of time, some since early childhood; that he was not a violent man; that he was a loving father; that he had endured substantial and traumatic adversity in the few years immediately preceding his crimes; and that he would not commit another crime should he ever be released from prison.

The Defendant committed the crimes in this case on October 15, 2005. The record contains three at least partial accounts of that day's events. The "official version" as it appears in the presentence report, reads, in part, as follows:

> Victim Charles Holbert and [the Defendant] were observed having a verbal atercation [sic] by witnesses who stated that the altercation escalated and that [the Defendant] went outside Mr. Holbert's residence; then, Mr. Holbert left the residence as well. The witnesses reported hearing a gunshot then seeing Farris with a shotgun in his hands before entering a pickup truck and leaving the scene.
> Mr. Holbert sustained a shotgun wound to the abdomen. He was transported to Vanderbilt Hospital and later died of his wounds.
> On the evening of 10/15/05, victim Paul Shortridge was in his home . . . . Mr. Shortridge heard the doorbell ring and answered the door, and [the Defendant] entered the residence armed with a shotgun.
> [The Defendant] told Mr. Shortridge, "I done killed a person and I will shoot you if you don't do what I say." At some point, [the Defendant] had Mr. Shortridge lie on the floor and prevented him from leaving the residence. [The Defendant] finally directed Mr. Shortridge, at gunpoint, to leave the house in an attempt to force Mr. Shortridge to drive him from the scene. Police apprehended [the Defendant] at that time.

The Defendant also testified about that day's events. He had been friends with Holbert since they were children. On October 15, 2005, the Defendant was in Holbert's motel room with another person, Mike Ingram. The Defendant and his friends used this motel room as a "party house." After using drugs, it occurred to the Defendant that Ingram still owed him some money. He got into an argument with Ingram about this debt. The argument "hit [Holbert] wrong," and Holbert started yelling at the Defendant and telling him to leave. The Defendant did so.

Holbert then followed the Defendant out of the hotel room and into the parking lot, threatening to "stomp [the Defendant's] brains out." The Defendant tried to get into his truck and leave, but Holbert would not let him. As Holbert came toward him, the Defendant "blacked out," picked up a nearby shotgun he had stolen from his mother, and shot Holbert. He then got into his truck and drove away.

Realizing he was low on gas, the Defendant stopped at a nearby bar. He asked a number of strangers for two dollars to buy gas, but none would give him money. After returning to his truck and continuing to drive for a period of time, the Defendant ran out of gas in front of a house belonging to Paul Shortridge. The Defendant rang the doorbell. Shortridge answered. The Defendant asked Shortridge whether he had any "lawnmower gas" the Defendant could have. Shortridge said he did not. Shortridge also denied the Defendant's request for a few dollars. At that time, a police car apparently pulled up behind the Defendant's parked truck. The Defendant forced his way into Shortridge's house, noticing one other man and two other women inside. The Defendant knew he had killed his friend, was scared, and wanted to die in a shootout with police.

To that end, he demanded that Shortridge give him guns and ammunition. Shortridge said he did not have any. The Defendant then asked Shortridge for the keys to the car in Shortridge's garage. Shortridge denied that he had the keys. The Defendant knew he was lying but did not want to hurt anyone else, so he let the two women go to the back bedroom, where they appear to have left through a window and alerted the police to the Defendant's presence inside the house. As more police arrived, the Defendant realized that, if he waited much longer, the police would use tear gas to apprehend him. This motivated him to surrender. The police shot him as he opened Shortridge's door, taking him into custody immediately thereafter.

On cross-examination, the Defendant admitted that he had his shotgun and one shotgun shell in his possession when he entered the Shortridge house. He thus would not have needed any more guns or ammunition in order to "persuade" the police to shoot him. He also acknowledged that, if he had threatened them with his shotgun, police would have shot him regardless of whether he actually fired on them. Fleeing in Shortridge's car, the Defendant admitted, was also not necessary to entice the police to shoot him. The Defendant acknowledged these logical inconsistencies, but he stated that his plan seemed to make sense to him at the time. He maintained that he never wanted to hurt a police officer or anyone else.

As to his responsibility for killing Holbert, the Defendant expressed remorse for what he had done and said that he had been tortured by it ever since. He also, however, said that "[w]hat I really like to say is in my heart that I really am not the one that killed [Holbert], drugs and alcohol killed [Holbert]." Further, the Defendant "could never kill [Holbert], but drugs and alcohol led to all the chaos, all the madness and everything went wrong that night."

Finally, the sentencing court, in announcing the basis for its decision, summarized some inconsistencies between the Defendant's testimony at the sentencing hearing and an earlier statement he had given to a homicide investigator:

[The Defendant] stated that he was scared of Holbert, that's consistent. [The Defendant] stated that Holbert stopped chasing him and stood at the door of the hotel room, that is not consistent. [The Defendant] stated that he took the shotgun out of the back of the bed of the truck bed and took a shotgun shell out of his pocket. [The Defendant] stated that he loaded the shotgun, he stated the he then shot Holbert. That's not at all consistent with what this Defendant testified to on the stand.

[The Defendant] stated that he remembers Holbert stating he shot me. [The Defendant] then stated that he tried to get back into the hotel room, but those inside wouldn't let him in. [The Defendant] stated that he then had a fight with Jerry Johnson who kept him from getting back into the hotel room. Then he stated he left in his truck and that he ran out of gas and nothing in there about this bar that I heard about now. But then he went to the house where these other individuals were and went into the house.

That's totally inconsistent with what this gentleman told me on the stand. He said that . . . the deceased was advancing on him when he shot him. That's not consistent with what he said. He took the shotgun out of his truck and had to load the shotgun before he shot the deceased in this case. And I've heard nothing about a fight with Jerry Johnson from the Defendant when he tried to get back into the hotel room. That's just inconsistent with what he told me.

At the conclusion of the hearing, the court sentenced the Defendant to serve his two eight-year aggravated kidnapping sentences concurrently. Those sentences were ordered to be served consecutively to his twenty-year sentence for second degree murder, however. The Defendant now appeals.

**Analysis**

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement

-4-

and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

Tennessee Code Annotated section 40-35-115 governs the determination of whether a defendant convicted of more than one criminal offense shall be ordered to serve those sentences consecutively or concurrently. Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of the following criteria applies:

> (1) The defendant is a professional criminal who has knowingly devoted the such defendant's life to criminal acts asa major source of livelihood;
> (2) The defendant is an offender whose record of criminal activity is extensive;
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to the consequences;
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical mental damage to the victim or victims;
> (6) The defendant is sentenced for an offense committed while on probation;
> (7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b). These criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997).

In State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995), our supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used: the court must find consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. Although such specific factual findings are unnecessary for the other categories enumerated in Tennessee Code Annotated section 40-35-115(b), the imposition of consecutive sentences is also "guided by the general sentencing principles that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" Imfeld,

70 S.W.3d at 708 (quoting Tenn. Code Ann. §§ 40-35-102(1), -103(2)); see also State v. Lane, 3 S.W.3d 456, 460 (Tenn. 1999).

The State first argues that the Defendant has waived his right to challenge his sentence by failing to provide a transcript of his guilty plea hearing. We agree that this omission would justify this Court considering the issue to be waived. See Tenn. R. App. P. 24(b). Having reviewed the record, however, we conclude it provides sufficient facts on which to evaluate the Defendant's arguments. We elect to do so.

The sentencing court relied solely on Tennessee Code Annotated section 40-35-115(b)(4) in ordering consecutive sentencing, finding the Defendant to be a dangerous offender. The Defendant correctly notes that the court failed to specifically address the Wilkerson factors as required. As such, the sentencing court's presumption of correctness is removed, and we review the Defendant's sentence de novo. See Ashby, 823 S.W.2d at 169.

The Defendant challenges his categorization as a dangerous offender, relying almost entirely on his own testimony at the sentencing hearing that he shot Holbert in self-defense, and that he did not intend to commit a crime or hurt anyone upon arriving at the Shortridge house. Taken as a whole, however, the record supports a finding that the Defendant's "behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). The record contains evidence that the Defendant loaded his shotgun before shooting Holbert. He then returned to the motel room and tried to force his way in. He later terrorized the occupants of the Shortridge house with his shotgun and intended to start a shootout with police from their home. We conclude this evidence is more than sufficient to support the trial court's finding that the Defendant is a dangerous offender.

We must also consider the two Wilkerson factors. First, we conclude that the Defendant's twenty-eight year sentence is reasonably related to the severity of the offenses he committed. See Wilkerson, 905 S.W.2d at 937-38. The Defendant's conduct originally gave rise to eleven felony counts, including charges for first degree murder, aggravated burglary, aggravated assault, aggravated robbery, and aggravated kidnapping. Again, his conduct included not only the murder of his friend, but also the invasion of a stranger's home and the forced confinement of its occupants before his violent apprehension by the police.

Second, we conclude that the Defendant's sentence is necessary to protect the public from further criminal conduct. See id. Although he apologized for shooting Holbert and expressed remorse, the Defendant consistently failed to accept responsibility for his actions, instead blaming alcohol and drugs. With respect to his invasion of the Shortridge home, he largely failed to acknowledge the traumatic effect of his actions on its occupants, instead insisting that he was simply soliciting their help in initiating a fatal encounter with police. Despite his witnesses' testimony that he is not a violent person, the Defendant's actions and testimony demonstrate that a twenty-eight year sentence is necessary to protect the public.

**Conclusion**

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
DAVID H. WELLES, JUDGE